UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.  CASE NO. 8:19-cr-609-T-33SPF

18 U.S.C. § 1349

BROOKS THOMAS NESBITT

## INFORMATION

The United States Attorney charges:

### COUNT ONE
**(Conspiracy to Commit Wire Fraud – 18 U.S.C. § 1349)**

#### A. Introduction

At times material to this Information:

1. A "boiler room" was a type of illegitimate sales operation that used high-pressure sales techniques, sophisticated mass-marketing, and misrepresentations to defraud individuals into believing they were investing money in regulated securities, financial products, stocks, and other investments.

2. BROOKS THOMAS NESBITT ("NESBITT") was a citizen of Canada and a resident of Thailand who operated boiler rooms outside of the United States and contracted with money launderers to move and conceal fraud proceeds.

3. Mary Kathryn Marr ("Marr") was a resident of Florida and a contract money launderer for NESBITT. Marr worked with Michel Marc Chateau ("Chateau") and others to open accounts at banks in the Middle District of Florida, and elsewhere, and recruited others to do so for her.

4. Chateau was a resident of Florida who opened accounts at banks in the Middle District of Florida, and elsewhere, and recruited others to do so for him, including Douglas Edwin Casimiri ("Douglas Casimiri").

5. Douglas Casimiri was a resident of Pinellas County, Florida, who opened accounts at banks in the Middle District of Florida, and elsewhere, and recruited others to do so for him.

6. Rose Marie Casimiri ("Rose Casimiri") was a resident of Hernando County, Florida, who was recruited by, and worked with, Douglas Casimiri and Chateau to open accounts at banks in the Middle District of Florida.

7. Albert Michael Rivere ("Rivere") was a resident of Florida who was recruited by, and worked with, Marr and Chateau to open accounts at banks in Florida.

8. The term "shell company" referred to a fictitious corporate entity that existed only on paper and had no legitimate employees, physical presence or business functions. A "shell company" was used as a vehicle to carry out

illicit activity, including financial transactions, while disguising the true nature and origin of the activity.

9. The term "loading" referred to a tactic used by boiler room sales agents to convince victims to send additional funds for a purported investment opportunity, or related fees and expenses, in order to obtain the return or profit that was initially promised.

10. The term "buffer" referred to a secondary bank account in the United States that was used to transfer and conceal foreign victims' money, so that banks would not see the victims' incoming wires being immediately wired back out to accounts overseas. Instead, the transfer to the secondary account would seem to merely be coming from another domestic account, which would look less suspicious to the banks.

### B. The Conspiracy

11. Beginning on an unknown date, but at least as early as in or around October 2014, and continuing through and including January 2019, in the Middle District of Florida and elsewhere, the defendant,

BROOKS THOMAS NESBITT

did knowingly and willfully combine, conspire, and agree with Marr, Chateau, Douglas Casimiri, Rose Casimiri, Rivere, and other persons, both known and unknown to the United States Attorney, to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and

fraudulent pretenses, representations, and promises that related to material facts, and, for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, any writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343.

### C. Manner and Means

12. The manner and means by which the conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

a. It was a part of the conspiracy that conspirators would and did use interstate and foreign wire communications to defraud individuals throughout the world, and to obtain funds from them by means of materially false and fraudulent pretenses and representations;

b. It was further part of the conspiracy that conspirators would and did incorporate shell companies with fictitious names and then open, and cause to be opened, bank accounts in the names of those shell companies at various federally insured financial institutions in the Middle District of Florida and elsewhere. These accounts were opened exclusively for the purpose of receiving, transmitting, or otherwise obtaining the proceeds of specified unlawful activity;

c. It was further part of the conspiracy that conspirators, when opening the bank accounts, would and did make materially false and fraudulent representations to the banks regarding the nature of the businesses that the shell companies were engaged in;

d. It was further part of the conspiracy that conspirators working for boiler rooms would and did contact foreign victims, via interstate and foreign emails and telephone calls, for the purpose of offering bogus investment and other financial opportunities. In truth and in fact, however, the purpose of those contacts was to gain their victims' trust and solicit money from them by means of materially false and fraudulent pretenses and representations;

e. It was further part of the conspiracy that conspirators working for boiler rooms would and did contact foreign victims, via interstate and foreign emails and telephone calls, for the purpose of "loading" them and soliciting even more money once the victims had been deprived of their initial investments;

f. It was further part of the conspiracy that conspirators working for boiler rooms would and did instruct victims to wire funds for the purported investment opportunities, and related fees and expenses, into the bank accounts of shell companies and other entities created and controlled by conspirators in the United States;

g. It was further part of the conspiracy that conspirators would and did contact foreign victims, via interstate and foreign mailings, emails, and telephone calls, for the purported purpose of having them renew trademarks that the conspirators claimed were set to expire. In truth and in fact, however, the conspirators were not acting on behalf of any legitimate trademark organization or government authority, and were soliciting money from the victims by means of materially false and fraudulent pretenses and representations;

h. It was further part of the conspiracy that conspirators would and did instruct victims to wire funds for the purported trademark renewals, and related fees, into the bank accounts of shell companies and other entities created and controlled by conspirators in the United States;

i. It was further part of the conspiracy that conspirators would and did contact foreign victims, via interstate and foreign emails and telephone calls, for the purported purpose of buying their collections of gems, precious stones, and jewelry. In truth and in fact, however, the conspirators did not intend to actually buy those collections, and were soliciting money from the victims by means of materially false and fraudulent pretenses and representations;

j. It was further part of the conspiracy that conspirators would and did instruct victims to wire funds to complete the sale of their collections of

gems, precious stones, and jewelry, as well as related fees, into the bank accounts of shell companies and other entities created and controlled by conspirators in the United States;

k.  It was further part of the conspiracy that conspirators would and did wire and send, and cause to be wired and sent, the proceeds that they had fraudulently obtained from victims to multiple financial institutions, including financial institutions located outside of the United States, in order to promote the carrying on of the aforementioned fraud schemes;

l.  It was further part of the conspiracy that conspirators would and did wire and send, and cause to be wired and sent, the proceeds that they had fraudulently obtained from victims to multiple financial institutions, including financial institutions located outside of the United States, in order to conceal and disguise the source of, and to hinder any efforts to locate, those proceeds;

m.  It was further part of the conspiracy that conspirators would and did withdraw, and cause to be withdrawn, in cash the proceeds that they had fraudulently obtained from victims, in order to conceal and disguise the source of, and to hinder any efforts to locate, those proceeds;

n.  It was further part of the conspiracy that conspirators would and did exchange interstate and foreign emails and phone messages to coordinate the defrauding of victims and the laundering of the victims' funds;

o. It was further part of the conspiracy that conspirators would and did share in the proceeds of the fraud schemes, usually receiving a set percentage of the proceeds that they received, withdrew, handled and transferred; and

p. It was further part of the conspiracy that conspirators would and did perform acts and make statements to misrepresent, hide, and conceal, and cause to be misrepresented, hidden, and concealed, the purpose of the conspiracy and the acts committed in furtherance thereof.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

1. The allegations contained in Count One of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of 18 U.S.C. § 982(a)(2).

2. Upon a conviction of a violation of 18 U.S.C. § 1349 as alleged in Count One, the defendant,

BROOKS THOMAS NESBITT,

shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(2), any property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as the result of such violation.

3. The assets to be forfeited include, but are not limited to, the following property which was involved in the offenses:

a. An order of forfeiture in an amount which represents the value of the property involved in the offenses;

b. Approximately $65,018.15 seized from account number 898066375392 at Bank of America;

c. Approximately $48,145.12 seized from account number 898066374584 at Bank of America;

d. Approximately $14,519.24 seized from account number 898090459051 at Bank of America;

e. Approximately $18,058.55 seized from account number 229055666131 at Bank of America;

f. Approximately $54,875.64 seized from account number 7908684595 at Fifth Third Bank;

g. Approximately $32,297.66 seized from account number 8898091888045 at Bank of America;

h. Approximately $25,781.03 seized from account number 0232235194 at Regions Bank;

i. Approximately $184,063.69 seized from account number 1000207756999 at SunTrust Bank;

j. Approximately $62,528.76 seized from account number 1000207220848 at SunTrust Bank;

k. Approximately $91.56 seized from account number 000000239332577 at JPMorgan Chase Bank;

l. Approximately $7,632.07 seized from account number 3666055078 at Northwest Bank;

m. Approximately $119,000 seized from account number 250508501 at JPMorgan Chase Bank;

n.  Approximately $261,000 seized from account number 250080618 at JPMorgan Chase Bank;

o.  Approximately $208,000 seized from account number 3633016580 at JPMorgan Chase Bank;

p.  Approximately $351,000 seized from account number 6622981378 at Wells Fargo Bank;

q.  Approximately $40,000 seized from account number 4346971173 at TD Bank;

r.  Approximately $88,037.01 seized from account number 207032350 at Citibank;

s.  Approximately $260,239.33 seized from account number 1895163689 at Comerica Bank;

t.  Approximately $44,371.00 seized from account number 229054841928 at Bank of America; and

u.  Approximately $236,485 seized from account number 36021908173 at Capital One Bank.

4. If any of the forfeitable assets described above, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third person;

(c) has been placed beyond the jurisdiction of the Court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. §853(p), as incorporated by 18 U.S.C. § 982(b)(1).

                                              MARIA CHAPA LOPEZ
                                              United States Attorney

By: _____
      Patrick D. Scruggs
      Assistant United States Attorney

By: _____
FOR
      Cherie L. Krigsman
      Assistant United States Attorney
      Chief, National Security and
      Cybercrime Section